IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

C.M., the Student, and B.M. and Ca.M.,    )
the Student's Parents    )
    )
v.    )    No. 3:20-cv-1088
    )
RUTHERFORD COUNTY SCHOOLS    )


**To: The Honorable Waverly D. Crenshaw, Jr., Chief District Judge**


## REPORT AND RECOMMENDATION

Currently pending are cross motions for judgment on the administrative record: one filed by Plaintiffs (Docket No. 29), which seeks reversal of the decision by an administrative law judge ("ALJ") that Plaintiff C.M. was not denied a free and public education by Defendant Rutherford County Schools ("RCS"), and one filed by Defendant RCS (Docket No. 32), which asks the Court to affirm the ALJ's decision. Plaintiffs have filed a response to Defendant's motion (Docket No. 35), Defendant has filed a response to Plaintiffs' motion (Docket No. 37), and both parties have filed a reply  (Docket Nos. 42 and43). This matter was recently referred to the undersigned Magistrate Judge for initial consideration and a Report and Recommendation. (Docket No. 46.)

For the reasons that follow, the undersigned Magistrate Judge recommends that Plaintiffs' motion (Docket No. 29) be **GRANTED,** and that the motion of Defendant RCS (Docket No. 32) be **DENIED**.

1

# I. BACKGROUND

## A. Relevant Law

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, offers federal funding to participating states, including Tennessee, for the purpose of providing a "free and appropriate public education" ("FAPE") to school-aged children with disabilities. *Id*. at §§ 1411, 1412. The IDEA mandates that children with disabilities, to "the maximum extent appropriate," should be,

> educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

*Id*. at § 1412(a)(5)(A). The "lynchpin" of the IDEA is a process referred to as the "individualized educational program" ("IEP"), which involves a meeting of the eligible student's parents, teachers, and representatives of the local educational agency (and can include the student), at which the parties discuss the child's progress and educational goals. *Id*. at § 1414; *Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ.*, 655 F. App'x 423, 426 (6th Cir. 2016) (citing *Honig v. Doe*, 484 U.S. 305, 311-12 (1988)). Based on discussions from this meeting, an IEP document is drafted, which "evaluates the child's academic achievement and functional performance, as well as [the child's] short-term and long-term goals." *Gibson*, 655 F. App'x at 426.

If a participating school district fails to provide a FAPE in accordance with the IDEA, the parent of the child in question can initiate an impartial "due process hearing" before an ALJ, who in Tennessee is employed by the Secretary of State, Administrative Procedures Division, and is trained in special education law. *Id*. at 426-27; 20 U.S.C. § 1415; Tenn. Code Ann. § 49-10-606.

Following exhaustion of this administrative remedy, the ALJ's decision may be appealed in federal court. 20 U.S.C. § 1415(i)(2).

### B. Underlying Facts[1]

Plaintiff C.M. was a fourth grader in Murfreesboro City Schools ("MCS") during the 2015-16 school year. In October 2015, he was diagnosed with dyslexia, which according to the Tennessee Department of Education's Dyslexia Resource Guide, involves numerous characteristics, including: phonological awareness; phonemic awareness; alphabet knowledge; sound/symbol recognition; decoding skills; encoding skills; and rapid naming.[2] It was subsequently determined that C.M. was eligible for special educations services under the IDEA based on a Specific Learning Disability ("SLD")—defined as "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations," 20 U.S.C. § 1401(30)(A)—that produced deficits in the category of "basic reading skills." MCS thereafter provided C.M. with specialized instruction pursuant to an

---

[1] Unless otherwise indicated, these facts are taken from the parties' respective briefs and the sealed administrative record and are undisputed.

[2] The terms are defined as follows: Phonological awareness: a broad category comprising a range of understandings related to the sounds of words and word parts; Phonemic awareness: the ability to notice, think about, and work with the individual sounds in spoken words; Alphabet knowledge: understanding that letters represent sounds, which form words; Sound/symbol recognition: understanding that there is a predictable relationship between phonemes (sounds in spoken language) and graphemes (the letters that represent those sounds); Decoding skills: using knowledge of letters and sounds to recognize and analyze a printed word to connect it to the spoken word it represents (also referred to as attack skills ); Encoding skills: translating speech into writing (spelling); and Rapid naming: ability to connect visual and verbal information by giving the appropriate names to common objects, colors, letters, and digits (quickly naming what is seen). Rapid naming: requires the retrieval of phonological information related to phonemes (letter/ letter combination sounds), segments of words, and words from long-term memory in an efficient manner. This is important when decoding words, encoding words, and reading sight words. (Docket No. 30-1 at 6.)

3

IEP that delineated annual reading goals and accommodations intended to help C.M. reach those goals.[3] C.M.'s final MCS IEP was formulated during the end of his sixth-grade year in May 2018, and it included four "measurable annual goals" aimed at reducing his basic reading deficits by improving his fluency, comprehension, spelling, and vowel-consonant word patterns. The IEP provided 30 accommodations in the subjects of Reading, English/Language Arts, Spelling, Writing, Math, Science, and Social Studies, which allowed C.M. to receive, among other things, extended time to complete assignments and tests, preferential seating in class, opportunities to re-do items on assignments that he answered incorrectly, use of audio recorded textbooks and materials, and access to teachers' lesson plans and notes prior to class. MCS utilized the Wilson Assessment of Decoding and Encoding ("Wilson") program to implement C.M.'s reading intervention services.

The IEP also provided C.M. with accommodations for standardized testing administered by the state of Tennessee for grades 3 through 8—known as "TNReady," which is part of the Tennessee Comprehensive Assessment Program ("TCAP")—in the areas of English/Language Arts, Mathematics, Science, and Social Studies. Specifically, C.M. was allowed extended time with breaks in all four areas, as well as the "Human Reader" or "Read Aloud" accommodation in the subjects of Science, Mathematics, and Social Studies, which involves an individual orally reading test questions to the student.[4]

_____

[3] In addition to dyslexia, the IEP noted C.M.'s diagnoses of attention deficit disorder ("ADHD") and anxiety.

[4] The IEP actually identifies "Reader (Text to Speech or Human)" as the accommodation provided for Science testing, while "Human Reader" is identified as an "accessibility feature" for testing in Mathematics and Social Studies. (Docket No. 20-4 at 1278.) However, Plaintiffs describe the IEP as "includ[ing] the accommodation of Human Reader for State Testing in the areas of Science, Mathematics and Social Studies" (Docket No. 30 at 3), a characterization that RCS does not appear to dispute.

4

On August 6, 2018, C.M. started a new school year as a seventh grader at Whitworth Buchanan Middle School ("Whitworth"), which is part of the RCS district. For any incoming student with an IEP, such as C.M., RCS administers its own IEP meeting to review and update the student's existing IEP. At the time of his transfer to RCS, C.M. had completed eight of the 12 steps comprising the Wilson program he used at MCS.

On August 23, 2018, B.M., who is C.M.'s mother, forwarded an email drafted by Dr. Melinda Hirschmann—the Assistant Director for Education Services and School Outreach at the Tennessee Center for the Study and Treatment of Dyslexia at Middle Tennessee State University—to Willard Caster, who would become C.M.'s new case manager at Whitworth, in which Dr. Hirschmann recommended that C.M. continue using the Wilson program. On August 24, C.M. took a Language! placement test that, according to RCS, was administered to help RCS determine "where to start" C.M.'s supportive services, including, "what level books that [C.M.'s] going to be on and which class [he's] going to be in" within the Language! program. (Docket Nos. 20-4 at 226; 37 at 15-16.) On August 30, RCS provided B.M. with notice of the IEP meeting that would be conducted on September 14 to discuss and craft a new middle school IEP for C.M.

The September 14 IEP meeting was attended by several individuals: B.M.; Eileen Miller, who served as an advocate for C.M.; Willard Caster, C.M.'s case manager; Chip Fair, the IDEA Compliance Specialist for RCS; Lana Bellar, the Assistant Principal at Whitworth; Marc Quarles, C.M.'s general education teacher for English Language Arts; and Angela Shofner, an Assistive Technology Facilitator for RCS. Mr. Caster brought a draft of an IEP document he had prepared to the meeting that included C.M.'s "Present Levels of Performance" ("PLEPs") in the areas of

reading fluency, reading comprehension, and pre-vocational skills, which were based on data obtained on August 8 and 15 through easyCBM testing, which is a system designed to help schools establish benchmarks and monitor a student's progress in different subjects. The data showed that C.M. had scored in the 69th percentile for reading comprehension, which was well above the 25th percentile cutoff for students who are generally entitled to special education services. This particular data point prompted Mr. Caster and the other RCS officials on the IEP team to endorse removal of three of the four reading goals that had been implemented in the MCS IEP, specifically those involving comprehension, spelling, and vowel-consonant word patterns. In response to an inquiry about C.M.'s PLEPs with respect to basic reading skills, which remained the SLD deficit forming the basis of the intervention services being provided, Mr. Caster responded that he had no such data but would ask Elizabeth Grace, C.M.'s reading intervention teacher, about C.M.'s progress in basic reading skills. However, Ms. Grace never collected any specific data pertaining to basic reading skills and does not recall Mr. Caster ever having asked her for such data.

The formulated IEP proposal set forth only one reading goal for C.M., which focused on progress in the area of reading fluency. The specific goal was to improve his scoring from the 8th percentile of his peer group (reading 101 words correctly per minute) to the 15th percentile (reading 121 words correctly per minute) by the end of spring benchmark testing in 2019. Although C.M. retained the extended time accommodation for TNReady testing in English/Language Arts, Mathematics, Science, and Social Studies, notably absent from the RCS IEP were any of the Human Reader accommodations that had been permitted for state testing under the MCS IEP.

B.M. expressed multiple concerns with the proposed IEP, including its provision of 45 minutes per day of reading intervention services that Ms. Grace would render pursuant to a

program called Language!. While RCS maintained that Language! was comparable to the Wilson program C.M. has previously followed, B.M. asserted that Wilson was the only program that adequately accommodated C.M.'s needs and enabled him to make real progress in his reading ability. All individuals present at the meeting, including B.M. and C.M.'s advocate, Ms. Miller, consented to the IEP document, although B.M. continued to disagree with its contents.

Because of her continued opposition to the IEP, B.M. requested a second IEP meeting, which took place on September 24, 2018. Individuals present were B.M., Mr. Caster, Mr. Fair, Ms. Shofner, Joshua Picklesimer, who was C.M.'s seventh grade social studies teacher, and the principal of Whitworth.[5] After approximately two hours of discussion, and apparently few alterations to the IEP proposed during the September 14 meeting, B.M. again consented. Two days later, B.M. sent a letter to Mr. Caster purporting to recap the discussions that took place during the September 24 meeting, and to again express her disapproval of the IEP formulation.

On January 10, 2019, the IEP team held a reevaluation meeting—which is a required meeting held every three years for any student with an IEP—to assess C.M.'s eligibility for continued special education services. The school officials believed that more data needed to be gathered before making any decision and therefore broached the possibility of conducting a comprehensive reevaluation to determine whether C.M.'s dyslexia continued to warrant access to special education services. At that meeting, B.M. gave her consent for the reevaluation, although she requested that C.M. additionally be evaluated for an "other health impairment" ("OHI") based on his ADHD diagnosis. RCS agreed, although B.M. proceeded to revoke her consent before the OHI evaluation took place. This led to an additional IEP meeting on January 29, at which point B.M. reversed course and reaffirmed her consent to the OHI evaluation.

---

[5] The name of the Whitworth principal as listed on the attendance sheet is not decipherable.

RCS psychologist Lauren Goss conducted the reevaluation. On April 4, 2019, following consideration of various benchmark data points, classroom observations, and input from C.M., his parents, and his teachers, as well as a battery of testing in January-February 2019, Dr. Goss concluded that C.M. likely did not meet the eligibility criteria for finding a continued SLD in basic reading, and recommended that her evaluation be shared with the IEP team to determine whether C.M. met the qualifications to continue to receive any specialized instruction under Tennessee Department of Education standards. Notable findings from her testing included scores placing C.M. in the 86th percentile (above average) for phonological awareness, 81st percentile for rapid automatized naming ("RAN") (above average), and the 12th percentile for phonological memory (below average).[6] The report was provided to the IEP team and, following a meeting on April 9 to discuss the results of Dr. Goss' evaluation, led the school officials who served on the IEP team to conclude that C.M. was no longer eligible for special education services.

On April 12, 2019, following this determination, the IEP team referred C.M. to a "504 Team" to consider whether C.M. qualified to continue receiving supportive services under a so-called "Section 504 Plan."[7] At this meeting, at which B.M. and Ca.M. (C.M.'s father) were present, the 504 Team determined that C.M. was eligible for services and developed a plan that provided 13 accommodations allowing him to: sit in an area free from distractions; use a fidget device;

---

[6] Phonological awareness involves the ability to hear, identify, and manipulate the individual sounds in spoken words, RAN involves how quickly a student can orally name symbols or objects, and phonological memory involves short-term memory of auditory information.

[7] Although not central to the current dispute, a Section 504 Plan is derived from section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794, which requires that any student with a disability be provided equal access to public schools and receive a FAPE regardless of the nature or severity of their disabilities. 34 C.F.R. § 104.33. A Section 504 Plan typically sets forth a broader definition of disability and involves less detail than an IEP, which, although not discussed by the parties, ostensibly explains Plaintiffs' opposition to implementation of a Section 504 Plan for C.M.

8

receive multiple, shorter assignments in lieu of long assignments; receive teacher notes prior to class; use "Bookshare"[8]; use assistive technology; avoid being called upon to read in class; use "time and a half" to complete assignments; use "time and a half" to complete tests; receive no penalty for spelling errors; take rest breaks during classroom teaching; receive cues and prompts to stay on task; and receive an opportunity for a "single oral retake" of any missed test questions. C.M.'s parents signed the Section 504, signifying their agreement with its provisions.

Nevertheless, Plaintiffs disagreed that C.M. was not eligible for special education services under the IDEA and proceeded to file a due process complaint with the Tennessee Department of Education on May 1, 2019, alleging that RCS failed to provide a FAPE to C.M. and requesting that the ALJ require RCS to provide C.M. with reading instruction pursuant to Wilson until all 12 steps of the program were completed. They also requested an Independent Educational Evaluation ("IEE"), which was agreed to and paid for by RCS and conducted by Dr. Emily Kirk at the Currey Ingram Academy Diagnostic Center in June 2019. After administering a series of tests, Dr. Kirk completed her report on August 28, 2019, which documented scores placing C.M. in the 14th percentile for basic reading (low average), 13th percentile for reading comprehension and fluency (low average), and the 5th percentile for spelling (very low). The report noted that C.M.'s scores were in the average range when he was asked to decode words without being timed, but he scored in the very low range when timed. Overall, his fluency and comprehension measurements were consistently in the low average range, which led Dr. Kirk to opine that he met the diagnostic criteria for an SLD "with impairment in reading." Dr. Kirk described the severity of C.M.'s dyslexia as "mild" but recommended that he continue receiving "research-based intervention" for his reading

---

[8] This gave C.M. the ability to "access his textbooks outside of school and also play them via audio." (Docket No. 20-4 at 1142.)

fluency and comprehension deficits, with an emphasis on phonological awareness, sound-symbol correspondences, and syllable patterns. (Docket No. 20-8 at 45, 47.)

During the 2018-19 school year at Whitworth, C.M. earned "A" marks in all subjects at Whitworth, although his TCAP scores in corresponding subjects were somewhat lower. He earned "C" marks in English Language Arts (75) and Social Studies (79), and a "B" mark in Honors-level Mathematics (89).

### C. Administrative Hearing

Plaintiffs' due process complaint alleged violations of the IDEA, Section 504, and the American with Disabilities Act ("ADA") during the 2018-19 school year. The parties participated in a four-day hearing before ALJ Rachel Waterhouse on July 28-31, 2020. Plaintiffs argued that RCS improperly determined that C.M. would receive supportive services under the Language! model of intervention before an IEP meeting had been convened based on the district's preexisting investment in the Language! program. On November 25, 2020, the ALJ entered a final order denying Plaintiffs' claims and ruling in favor of RCS on all issues. As part of the order, the ALJ made the following relevant enumerated findings:

> 37.   It is CONCLUDED that C.M.'s 2018-2019 school year IEP provided C.M.
>       with FAPE during his 7th grade school year and there was no procedural
>       violation of the IDEA
> …
>
> 50.   It is CONCLUDED that RCS thoroughly evaluated C.M. in order to obtain
>       reliable baselines and present levels of functioning for which to design
>       appropriate goals and service designations for C.M.'s specialized
>       instruction, and there was no procedural violation of the IDEA.
> …
>
> 63.   It is CONCLUDED that RCS developed appropriate goals for C.M. in all
>       deficit areas, based on all of the input considered, and there was no
>       procedural violation of the IDEA.
> …

73.     It is CONCLUDED that RCS provided specific instruction to meet the unique needs of C.M. in accordance with the IDEA, and there was no procedural violation of the IDEA.

…

94.     It is CONCLUDED that RCS did not predetermine C.M.'s exit from special education, and there is no IDEA violation.

95.     It is also CONCLUDED that RCS did not predetermine the accommodations that would be included in C.M.'s IEP or the reading program that would be used in C.M.'s intervention class.

…

104.    It is CONCLUDED that RCS did not violate Section 504 or the ADA because RCS provided C.M. with proper accommodations and services.

The hearing involved testimony from numerous individuals, including: Mr. Caster; Mr. Fair; Sandy Parus, a "dyslexia practitioner" retained by B.M. after the due process complaint was filed to provide private tutoring to C.M. using the Wilson program; Ms. Grace; Kate Kasuboski, the Special Education Coordinator for RCS; Dr. Goss; Mr. Quarles; Reggy Skelton, who served as C.M.'s case manager and reading intervention teacher for the 2019-20 school year; Ca.M.; B.M.; C.M.; Joshua Picklesimer, who was C.M.'s seventh grade social studies teacher; and, Lucy Pittenger, a school counselor at Whitworth. The Court will briefly summarize this testimony.

### Willard Caster

Mr. Caster, who served as C.M.'s case manager at Whitworth and led the initial IEP team discussions, testified that the reason the IEP designed for C.M. for the 2018-19 school year provided fewer accommodations was because students in RCS middle schools do not need most of the accommodations that were included in C.M.'s elementary school IEP. He explained that C.M.'s reading intervention services were reduced from 60 minutes per session to 45 minutes per session only because unlike the hour-long class periods in elementary school, Whitworth's full

class periods were only 45 minutes. Mr. Caster also stated that while he considered the information provided by Dr. Hirschmann regarding C.M.'s progress with the Wilson program in formulating the draft IEP document he brought to the September 14 meeting, he did not provide Dr. Hirschmann's email to the IEP team beforehand because RCS middle schools did not utilize Wilson at the time. Mr. Caster further testified that prior to the meeting, he provided B.M. with C.M.'s easyCBM data in the fields of reading fluency, reading comprehension, and mathematics, but that B.M. was not given the results of C.M.'s Language! placement test based on directives from RCS' central office.

Additionally, Mr. Caster explained during the hearing that Whitworth's IEP team removed the spelling goals that were part of C.M.'s elementary school IEP because RCS middle schools do not grade a student's ability to spell. He also testified that the IEP team removed the Human Reader accommodation contained in the MCS IEP based on test scores that placed C.M. in the 69th percentile for reading comprehension, which is well above the intended target for Human Reader instruction: namely, students scoring in the 10th percentile or less in reading comprehension.

Mr. Caster noted that although he did not sign the IEP in the space designated for "Interpreter of Evaluation Results," he did in fact serve in that capacity. He asserted that easyCBM data indicated that, although C.M. reads more slowly than the average student, his reading accuracy and comprehension are at very high levels. He stated that the possibility of ending C.M.'s special education services was not broached until the January 10, 2019, reevaluation meeting, and claimed that although C.M.'s scores in multiple areas of the state's standardized TCAP tests were lower during the 2018-19 school year—during which C.M. did not have access to the Human Reader accommodation—it did not demonstrate that the additional accommodations were needed since many students' TCAP scores were lower that school year.

12

**Chip Fair**

Mr. Fair testified that there is no difference between an "elementary school" accommodation and a "middle school" accommodation since accommodations are tailored to meet the subject student's specific needs regardless of grade level. He confirmed that he, as the RCS Compliance Specialist, did not order Mr. Caster to withhold a copy of the draft IEP brought to the September 14 meeting from B.M. He also stated that when training teachers on how to formulate an appropriate IEP, he advises them to avoid including a specific methodology in any proposed IEP—i.e. identifying the particular intervention program that will be used for the student—because it would unnecessarily wed the school to that methodology and prevent RCS from quickly and efficiently shifting to a different program to meet the student's changing needs.

**Sandy Parus**

Ms. Parus began tutoring C.M. using the Wilson program beginning in October 2019. Ms. Parus testified that, based on testing she conducted pursuant to the Wilson criteria in April 2019, C.M. continues to demonstrate deficits in basic reading skills, specifically in the areas of phonological memory and sound-symbol awareness, and that he will not be able to eliminate the sound-symbol deficits without explicit instruction. She also described her observations of C.M.'s reading intervention class in January 2020, during the winter term of C.M.'s eighth grade year, which, according to her, included no multisensory techniques and an instructor's erroneous description of the letter combination "C-K" as a "blend" instead of a "digraph."

**Elizabeth Grace**

Ms. Grace confirmed that she did not collect any basic reading data for C.M. She acknowledged that C.M. spent the entire 2018-19 school year in Unit 13 of Book C of the

13

Language! program despite the unit being designed for completion within five to six weeks.[9] She explained, however, that she did not finish within the anticipated timeframe because she wanted to ensure that she covered every step included in the unit for the benefit of both her students—C.M. and another student in the intervention class—and that she frequently supplemented her class with Orton Gillingham activities, which were "welcomed" by the Language! instructors who had trained her in the program.[10] She stated that she did not require C.M. to complete any of the lesson checklists as intended by the Language! guidelines, nor did she administer all three of the benchmark tests that were intended to measure C.M.'s progress in Book C.

Ms. Grace testified that she did not believe C.M. needed special education services. She described C.M.'s completed writing assignments as "advanced," and noted that he sometimes helped the other student with that student's assignments. She also stated that C.M. tended to do better with reading passages of text to her when he wore his prescription glasses.

### Kate Kasuboski

Ms. Kasuboski, the RCS Special Education Coordinator, testified that the Language! and Wilson reading programs were "comparable" in that they assess the same skills, namely phonemic awareness, phonics, fluency, reading comprehension, and vocabulary. She could not identify any other schools in the district that utilized Wilson. She also stated that RCS had previously "looked

---

[9] There are six "Books" within the Language! program—starting with Book A (the most intensive intervention) and ending with Book F (the least intensive intervention)—each of which contains six "units" that aim to progressively enhance a student's literacy, although no student is expected to complete all six of the Books.

[10] According to the website of its namesake academy, the Orton-Gillingham approach is "a direct, explicit, multisensory, structured, sequential, diagnostic, and prescriptive way to teach literacy when reading, writing, and spelling does not come easily to individuals, such as those with dyslexia." *See https://www.ortonacademy.org/resources/what-is-the-orton-gillingham-approach/* (last visited February 22, 2022).

14

at Wilson training, and that it was not available [in] Tennessee," which would have required RCS to send its teachers out of state to obtain such training.

**Lauren Goss**

Dr. Goss served as a school psychologist at Whitworth during the 2018-19 school year and conducted the comprehensive reevaluation of C.M. that led the IEP team to endorse termination of his special education services in April 2019. She testified that the evaluation did not include any specific testing of sound-symbol association but that such a measurement would fall under the rubric of basic reading, which was an area she tested. She noted that as part of her evaluation, she conducted a "gap analysis" to measure C.M.'s rate of improvement with respect to grade level reading fluency, which indicated that as of February 2019, C.M. had improved from 101 words correctly identified per minute at the start of the school year to 142 words correctly identified per minute. Because this fluency measurement was above the 25th percentile on grade-level texts when compared to C.M.'s same-grade peers, and therefore within the "average" range as defined by the state of Tennessee—Dr. Goss did not assess what is known as "automaticity," which involves a timed test measuring how quickly a student can read presented words.

Dr. Goss asserted that no single data point should be used to determine whether a student is eligible for special education services. She noted that in response to the Woodcock-Johnson Tests of Achievement, C.M. fell in the average range for basic reading skills cluster testing (45th percentile compared to same-age peers), reading fluency testing (30th percentile compared to same-age peers), and reading comprehension cluster testing (59th percentile compared to same-age peers). She also stressed that these results were produced without the benefit of any IEP accommodations.

15

Dr. Goss additionally discussed the results of the Comprehensive Test of Phonological Processing she administered, which measures three areas: phonological awareness, phonological memory, and RAN. For phonological awareness and RAN, C.M. actually placed in the above average range (86th and 81st percentile, respectively). She acknowledged that his phonological memory composite was below average (12th percentile) but added that this area of phonological processing, along with RAN, is not something that can be meaningfully improved with intervention services anyway.

According to Dr. Goss, C.M. can read with high accuracy grade-level text at a rate that is "on the higher end of average" compared to his same-age peers. She stated that consultations with C.M.'s teachers indicated that he had been "one of the highest performers" on benchmark assessments during his seventh grade year. She also acknowledged that C.M. still needs extended time to complete assignments but opined that such an accommodation could be provided as part of a Section 504 Plan. She further asserted that C.M. could do without any of the audio presentations or Human Reader accommodations, and that C.M. had relayed to her that he found it "annoying" when such oral reading took place because it was done at a slower pace than he was able to maintain.

**Marc Quarles**

Mr. Quarles testified that C.M. was an excellent student in his general education English Language Arts class. He stated that C.M. generally scored "in the highest group on our school-wide assessments." He noted that C.M. received "A" marks in his class and estimated that C.M.'s "nine-week" test score—which is used to measure a student's progress prior to standardized state testing at the end of the school year—was among the top 15 of his 150 total students. He agreed with the IEP team's decision that C.M. did not meet the criteria for special education services.

16

Mr. Quarles represented that C.M. carried his IEP with him to class. He remembered one occasion on which C.M. approached him to make sure he was aware of the IEP provision requiring teachers to provide their notes to him before class started. Mr. Quarles could not remember whether he had ever needed to give C.M. an opportunity to redo a missed test item with oral presentation of the item.

### Reggy Skelton

Mr. Skelton served as C.M.'s case manager and reading intervention teacher for the 2019-20 school year. He testified that C.M. was "doing great" in his eighth grade classes, noting that he achieved straight "A" marks and made the principal's honors list. Although fluency was still an area of weakness, he noted that C.M. had improved throughout the school year, starting the year with a benchmark score that placed him in the 21st percentile and moving up to the 32nd percentile on the second benchmark. He also noted that C.M. volunteers to read in his class and highlighted the high accuracy and rate marks he attained in Lexia, which is the structured literacy program Mr. Skelton was apparently utilizing.

### Ca.M. and B.M.

Ca.M. testified that he occasionally helped C.M. with homework, primarily by reading terms in his science textbook to him. He asserted that C.M. made progress during seventh and eighth grade but that he continued to struggle putting words together.

B.M. testified that she was advised by a special education director for RCS in September 2018 that the Wilson program was available in the district. She stated that during the September 14 meeting, RCS officials were not interested in reviewing a binder she had brought containing all of C.M.'s psychoeducational testing dating back to second grade. She stated that she did not receive the Language! placement test that C.M. took in August 2018 until discovery was conducted in

17

connection with the administrative hearing. She did not recall presenting the IEP team or anyone at RCS with information regarding C.M.'s vision.

B.M. acknowledged that Eileen Miller opined following the September 14 meeting that C.M. did not need goals for basic reading or reading comprehension, and that reading fluency represented his only area of need for special education services. She also confirmed that she was generally satisfied with the accommodations provided in C.M.'s Section 504 Plan.

### C.M.

C.M. testified that there have been times at school when his teachers were not fully aware of what his accommodations were, but he also asserted that the teachers would quickly shift and work with the accommodations once he brought them to their attention. Because of such incidents, he carries his IEP in a binder everywhere he goes at school. He added that his teachers did a "decent" job of making sure his accommodations were met but that they "could have done better."

### Joshua Picklesimer

Mr. Picklesimer was C.M.'s seventh grade social studies teacher and a member of the IEP team. He testified that C.M. performed well in his class and described him as a "very bright individual." He also commended C.M.'s work product and work ethic. He stated that he did not recall C.M. ever taking an oral re-test despite having the option to do so.

### Lucy Pittenger

Ms. Pittenger was a school counselor at Whitworth during C.M.'s seventh grade year. She discussed "ACT Aspire scores," which are intended to measure how a student might perform on the ACT test later in high school in the categories of English, reading, science, and math. She noted that C.M.'s scores were strong in all areas and that his overall composite score was in the 79th percentile. Notably, the only accommodation that C.M. was given for this testing was extended

time. Ms. Pittenger averred that although the ACT Aspire testing is not necessarily a good indicator of how a student will score on the actual ACT, she was encouraged to see benchmarks demonstrating that he was "exceeding" ACT readiness in English, and "ready" for the reading portion of the ACT.[11]

## II. ANALYSIS

### A. Standard of Review

When a party files a federal complaint seeking judicial review in an IDEA action, the presiding court must review the administrative record, hear additional evidence at a party's request, and grant relief based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). This distinctive form of review has been described as a "modified *de novo*" standard, *Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018), under which the reviewing court is directed to "make an independent decision based on the preponderance of the evidence" while giving "due weight to the determinations made during the state administrative process." *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982)). This review requires the court to independently re-examine the evidence. *Id.* (quoting *Doe v. Metro. Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir. 1998)).

"[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000). The party seeking relief from the administrative decision bears the burden of proof. *Schaffer v. Weast*,

---

[11] The scores are divided into four categories of ACT readiness: "in need of support" (lowest); "close"; "ready"; and "exceeding" (highest).

19

546 U.S. 49, 51 (2005) (holding that the burden of proof rests on the party seeking relief in the administrative phase).

Originally developed in the Supreme Court's *Rowley* decision, the court's review is characterized as a two-part inquiry concerning: (1) whether the subject school district complied with the procedures set forth in the IDEA; and (2) whether the school district complied with the substantive provisions of the IDEA by providing an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Deal*, 392 F.3d at 853–54. Although the IEP at issue must be "strictly review[ed] … for procedural compliance," a procedural violation does not constitute a denial of a FAPE unless it also produces substantive harm. *Id.* (citing *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)). And if the school system meets procedural requirements of the IDEA, "greater deference is to be afforded to" the school district's decision. *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999).

In reviewing substantive compliance, courts are not permitted to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Deal*, 392 F.3d at 854 (quoting *Rowley*, 458 U.S. at 206). Courts are also cautioned to "to avoid imposing their view of preferable educational methods" on the school districts since the "primary responsibility for formulating the education to be accorded a [a child with disabilities], and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* (citing *Rowley*, 458 U.S. at 207).

### B. Plaintiffs' Claims

Plaintiffs' complaint alleges that RCS committed six violations of the IDEA that include: (1) predetermining the accommodations that would later be included in C.M.'s IEP;

20

(2) predetermining C.M.'s reading intervention program; (3) failing to thoroughly evaluate C.M. in all deficit areas; (4) failing to develop goals in all deficit areas; (5) failing to provide specialized instruction to meet C.M.'s unique needs; and (6) determining that C.M. was no longer eligible for special education. As relief, Plaintiffs seek a reversal of the ALJ's due process decision, a declaration that RCS failed to provide C.M. with a FAPE during the 2018-2019 school year, a declaration that C.M. remains eligible for special education under the IDEA, an order awarding compensatory education in the form of intensive reading instruction using the Wilson Reading System, an order compelling RCS to provide C.M. with reading instruction using the Wilson Reading System until he has completed all 12 steps, and any other relief the Court deems appropriate.

In their motion seeking judgment on the administrative record, Plaintiffs argue that RCS failed to provide C.M. with a FAPE in five ways: (1) by predetermining significant portions of the IEP; (2) by failing to provide C.M.'s parents with relevant data; (3) by failing to design an IEP that included objective data and appropriate goals in all areas of purported disability; (4) by failing to ensure that an appropriate interpreter of evaluation results attended all IEP meetings; and (5) by failing to implement C.M.'s reading intervention with fidelity. RCS, in turn, asks the Court to affirm the ALJ's due process decision and declare RCS to be the prevailing party. The Court now turns to the parties' arguments.

**1. Alleged Procedural Violations**

**a. Predetermination of the IEP.**

Plaintiffs contend that RCS had improperly established portions of C.M.'s IEP by the time the IEP team met on September 14, 2018. Plaintiffs assert that while C.M. was permitted 30 accommodations in his MCS IEP, the draft Mr. Caster brought to the IEP meeting removed all

but eight of these based on an erroneous belief that such accommodations were not appropriate for a middle school IEP curriculum. Plaintiffs note that the Tennessee Department of Education explicitly rejects implementation of IEP accommodations based on a student's grade level, *see* Tennessee Comprehensive Accessibility and Accommodations Manual, pp. 33-34, *available at* https://www.tn.gov/content/dam/tn/education/testing/ComprehensiveAccessibilityAccommodati onsManual_20200211.pdf (last visited February 17, 2022). Plaintiffs also challenge the decision of RCS to exclude the Human Reader accommodation from the 2018-19 IEP for state testing by pointing to C.M.'s lower TCAP scores and attributing this decline to the absence of the accommodation.

Plaintiffs additionally accuse RCS of improperly predetermining that C.M. would be instructed according to the Language! model during the 2018-19 school year. Plaintiffs highlight the prior awareness of RCS that C.M. had studied under the Wilson model for several years, completed 75% of the Wilson program, and demonstrated substantial progress through Wilson instruction at the time of the IEP meeting. Plaintiffs also note Mr. Caster's testimony that he was not familiar with the Language! program and unable to describe how it compared to Wilson.

The Court first notes that a school district is not barred from preparing and bringing to an IEP meeting a draft IEP document containing the district's recommendations:

> Predetermination is not synonymous with preparation. Federal law prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions. We have emphasized that this participation must be more than mere form; it must be meaningful.

*Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006) (citations omitted) (cleaned up).

Put another way, the question is whether the school officials involved in the IEP process are

"willing to listen to the parents" and "come to the meeting with suggestions and open minds, not a required course of action." *Deal*, 392 F.3d at 858 (citation omitted).

Based on the evidence set forth in the administrative record, the Court concurs with Plaintiffs that RCS committed a procedural violation by entering the IEP process with the intent of forcing C.M. and his parents to accept instruction in Language! for his reading intervention services. The Court bases this finding primarily on numerous indications that RCS intended to implement Language! without any regard for C.M.'s prior progress in Wilson, the reasonable requests of his parents to utilize the Wilson program, or the recommendation of Dr. Hirschmann that C.M. continue receiving instruction pursuant to Wilson.[12] It is true that multiple RCS officials testified that other literacy programs were available in the county. For example, Mr. Quarles noted that SRA was a reading program used by other RCS schools. (Docket No. 20-4 at 1065.) Mr. Caster stated that he also taught SRA corrective reading, and Ms. Kasuboski testified that Language! was just "one of the options" among many others available, including Lexia and S.P.I.R.E. (*Id.* at 87, 720.)

Yet there is ample evidence suggesting that RCS did in fact determine that Language! would be C.M.'s intervention program well before the initial IEP meeting. For one, none of the RCS officials who listed other literacy programs in the district testified that such programs were considered *for C.M.* at Whitworth during the 2018-19 school year. There is also no dispute that C.M. took a Language! placement test three weeks prior to the September 14 meeting, one that RCS concedes was used to determine where C.M. would begin his intervention studies *in the Language! program.* (Docket No. 37 at 15-16.) This is consistent with the posture of RCS during

---

[12] RCS correctly notes that Dr. Hirschmann's email was admitted "for the limited purpose that it was considered by Mr. Caster." (Docket No. 37 at 2 n.1.) Here, the Court concludes only that Mr. Caster did not meaningfully consider the email.

the course of discovery, where it made clear, in response to an interrogatory asking how RCS reached its decision to use Language! for C.M.'s intervention, that "Language! is the selected methodology of Rutherford County Schools (district wide) for literary deficiencies …." (Docket No. 20-8 at 58.) Mr. Caster also testified unequivocally at the administrative hearing that when he was presented with Dr. Hirschmann's suggestion that C.M. would benefit from continued Wilson instruction, he could only "look at what [C.M.'s] scores would be and try to equate it to what we would use in Language!" because "we don't use Wilson." (Docket No. 20-4 at 94, 96). Such evidence is sufficient to establish that RCS did not meaningfully consider a literacy program other than Language!.

The Court similarly concludes that RCS improperly predetermined that C.M. would not receive the same quantity or quality of accommodations he had received at MCS. Mr. Caster repeatedly admitted that he eliminated several of C.M.'s accommodations from the draft IEP document based solely on the fact that C.M. was entering middle school. (*Id*. at 89, 114, 1332.) Yet as noted by RCS' compliance specialist, there is no authority suggesting that accommodations provided for students in elementary school are somehow unique and cannot apply to individuals in middle school. (*Id*. at 253.) The resolute unwillingness by the IEP team to entertain accommodations for an IEP based on arbitrary reasons represents a procedural violation of the IDEA.

RCS responds to the predetermination claim by highlighting the involvement of Eileen Miller—owner and operator of an organization called Ignite Dyslexia in Williamson County, Tennessee—who noted that B.M. was "involved and able to interject, comment, and make suggestions" during the September 14, 2018, IEP meeting. (Docket No. 20-1 at 89.) Yet even if Ms. Miller ultimately believed that B.M. was involved in the process, this does not disprove that

24

RCS had already determined that Language! would be utilized for C.M.'s seventh grade year. Ms. Miller's opinion is also somewhat dubious given that Mr. Caster, despite being the de facto leader of the IEP team, was unfamiliar with Language! at the time of the September 14 meeting (Docket No. 20-4 at 161), and thus not equipped to meaningfully explain how selecting between Language! and Wilson was, according to his testimony, as insignificant as choosing between "a Tylenol or an Advil." (*Id*. at 81.)

The Sixth Circuit has emphasized that improper predetermination of an IEP exists in situations where "no matter how strong the evidence presented by the [parents], the School System still would have refused to provide the services" requested for their child. *Deal*, 392 F.3d at 858 (6th Cir. 2004)." Given the strict review that must be applied when considering procedural compliance, *Dong*, 197 F.3d at 800, the Court necessarily concludes that RCS committed a procedural violation by predetermining C.M.'s reading program.

The Court now examines whether such procedural irregularities resulted in substantive harm that deprived C.M. of a FAPE. The Sixth Circuit's description of an example of substantive harm is useful in this regard: "Substantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process." *Knable*, 238 F.3d at 765. Such serious infringement can be established when a school district fails to explain the methodology underpinning an educational program offered to parents during the IEP process, a situation on display in *P.C. v. Milford Exempted Village Schools*, a case from a sister district court cited in Plaintiffs' brief to bolster their argument for finding substantive harm in RCS' conduct. No. 1:11-CV-398, 2013 WL 209478 (S.D. Ohio Jan. 17, 2013). The facts in *Milford* involve a school district improperly entrenching itself in a preferred administrative course of action that would remove a child from a privately-owned facility and place him back in his home public

25

school without giving the parents a meaningful opportunity to compare the competing intervention services at issue. *Id*. at *6-9.

Such tactics certainly bear some resemblance to the situation in which Plaintiffs currently find themselves. There are unquestionably differences in magnitude that distinguish *Milford* from the instant case, which RCS understandably emphasizes. For one, the court in *Milford* highlighted "troubling" evidence that some IEP members determined before the initial IEP meeting that they would not agree to let the subject child stay at the private facility without administrative or judicial intervention requiring such action, *Id.* at *6, which represents a type of obstinacy that was at least not outwardly expressed by anyone at RCS. And the individual at issue in *Milford* suffered from what could reasonably be characterized as more severe disabilities—including motor problems and a low IQ, *id.* at *1—thus arguably making the abrupt shift in the student's educational environment a more drastic consequence than what is at stake in the current matter.

Still, the *Milford* opinion offers insight that is pertinent to the issues involved here. For example, the district judge emphasized the inequity caused by a school district's failure to discuss with parents the type of reading program the subject student "would most benefit from," as well as its adoption of a "negative choice—that is, it decided only what would *not* happen, not that it in good faith engaged in a process to determine what should happen in [the student's] best interest." *Id.* at *6 (emphasis added). Similar intransigence seems to have been fostered by RCS in this matter judging by the lack of discussion regarding the Wilson program at the September 14 meeting despite B.M.'s early requests for such consideration. (Docket No. 20-4 at 1287.) Also relevant, the judge in *Milford* suggested that in a case involving a student who has demonstrated success in a specific methodology, as is the case here, the school district should take special pains

26

to explain the separate methodology being advanced by officials at an IEP meeting, *id*. at *8, which is an endeavor that RCS appears to have neglected in this case. (Docket No. 30 at 18.)

It is true that the IDEA entrusts "primary responsibility for choosing the educational methods most suitable for a disabled child's needs to local educational agencies," and parents "have no right to compel a specific program or methodology." *Hupp v. Switzerland of Ohio Loc. Sch. Dist.*, 912 F. Supp. 2d 572, 598 (S.D. Ohio 2012) (citing *Tucker by Tucker v. Calloway Cty. Bd. of Educ.*, 136 F.3d 495, 505 (6th Cir. 1998)). Nonetheless, this process requires "collaboration with the child's parents," *id*., which poses a less than onerous standard that requires the school merely to present an "open mind" and consider relevant data before committing the student's feet to a particular IEP path. Because it does not appear that RCS fulfilled this obligation, the Court concludes that the IEP prevented Plaintiffs from meaningfully participating in the IEP process and thus precluded C.M. from enjoying a FAPE during the 2018-19 school year.

### b. Failure to Provide Relevant Data.

Plaintiffs also contend that RCS prevented B.M. from meaningful participation in the IEP meeting by failing to provide the results of C.M.'s Language! placement test. The ALJ concluded that this contention was "without merit" given that the placement test results were not "pertinent to crafting IEP goals." (Docket No. 20-1 at 132.) Plaintiffs nevertheless note that Mr. Caster and Ms. Grace both had access to the data prior to the September 14 IEP meeting but failed to share this information with B.M. despite her repeated requests. RCS responds by echoing the ALJ's finding that the placement data are irrelevant to the IEP process, and that the scores are used only to determine where a student will begin the Language! intervention and not to establish a benchmark of progress in any particular subject.

27

The IDEA requires that parents of a child with a disability be afforded the opportunity "to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child …." 20 U.S.C. § 1415(b)(1). On September 4, 2018, 10 days before the initial IEP meeting, B.M. asked Mr. Caster to provide her with "any data" collected by RCS so far during the 2018-19 school year, including the results of any placement testing. (Docket No. 20-5 at 2.) Four days after the meeting, B.M. emailed Ms. Grace again seeking C.M.'s Language! placement testing results, who referred B.M. to Mr. Fair. (*Id*. at 22, 104.) B.M. testified that she then proceeded to leave a voice message for Mr. Fair requesting this data. (Docket No. 20-4 at 1151.)

Because the Court remains obligated to strictly review a school's actions for procedural compliance, it again concludes that RCS committed a procedural violation by failing to supply the Language! placement data prior to the September 14 IEP meeting. Ms. Kasuboski opined that an IEP team should consider any data in its possession that is "relevant to the student's deficit area," and noted that the placement test data "might help the team, if they know the program, to construct an adequate goal." (*Id*. at 779, 785.) In other words, such data could have affected the IEP decision by enabling the team to better tailor the reading program to C.M.'s particular needs. It strains credulity to suggest that such data would not fall within the broad category of "records relating to such child" in the IDEA context. 20 U.S.C. § 1415(b)(1). It also bears noting that RCS did not actually challenge B.M.'s entitlement to the information; to the contrary, RCS officials referred her to Chip Fair to obtain it. This further suggests that the failure to provide the data represented a procedural fumble and not active defense of the document. The Court thus concludes that B.M.'s three unsuccessful attempts to obtain the data gave rise to procedural error on the part of RCS.

Nevertheless, the Court must still determine whether this resulted in substantive harm. The placement test itself—or at least the exhibit containing the test—does not place the scores in any meaningful context for a lay reader. However, the exhibit does show a 795 number corresponding to "Language! Reading Scale" placement that is designated as the first of three benchmarks to be measured for C.M. during the 2018-19 school year. (Docket No. 20-6 at 36.) Later, the 795 number is described as "Lexile," which Ms. Grace testified is a measurement of a student's current reading level. (Docket No. 20-4 at 546-47.) Ms. Grace also testified that according to the Language! placement test metrics, this 795 score corresponded to a reading level equivalent to that of an eight-year-old student in the third grade, which would obviously be much lower than C.M.'s seventh grade status. (Docket Nos. 20-4 at 563; 20-6 at 43.)

More context can be gathered from the hearing testimony. As noted, Ms. Kasuboski asserted that an IEP team should consider any data that is "relevant to the student's deficit area" (Docket No. 24 at 779), which is significant given that C.M. started his seventh-grade year with an established SLD in basic reading skills. Ms. Kasuboski also testified, in an answer that should be fully excerpted, that the placement test data could aid in formulating which goals to include in the IEP:

> I think that's information that the team would not necessarily write down in a PLEP because it's so book specific it may not make sense to -- we always say that it should pass a stranger test; however, it might help the team, if they know the program, to construct an adequate goal. So there may be discussion about it in reference to what skills would be addressed at that level.

(*Id*. at 779, 785.) Plaintiffs are indisputably contesting the adequacy of the goals included in the IEP, one of which is the failure of RCS to include a goal in the area of basic reading skills. (Docket No. 30 at 21.) Moreover, the Language! teacher's manual suggests that LRS benchmark scores can be translated into Lexile scores—such as the 795 Lexile from C.M.'s placement test—that in turn

29

serve as "good data to use on your IEP's." (Docket No. 20-6 at 26.) Such information thus appears to be *significantly* relevant to a student's IEP.

Relying on Mr. Caster's testimony, RCS responds that the placement score was not considered by the IEP team because such data "was used solely to place [C.M.] in Language! and not to determine his overall benchmark on a specific subject or reading skill that would be pertinent to crafting IEP goals." (Docket No. 37 at 16.) This answer is unsatisfying for a number of reasons. First, Mr. Caster's status as an authority on how Language! placement data is used is questionable at best given his testimony that he is unfamiliar with the Language! program. (Docket No. 20-4 at 161.) Second, the idea that such data has no bearing on IEP goals is contradicted by the testimony of RCS' own Special Education Coordinator, Ms. Kasuboski, as well as Language! training materials. And notably, C.M.'s most recent IEP at MCS, dated May 16, 2018, notes that C.M. has deficits in basic reading skills that "affect his performance in reading fluency and comprehension …. He requires accommodations and instructional supports to be successful in the general education classroom." (*Id.* at 1265-66.) The Court is simply not convinced by the assurances of RCS that the placement data is irrelevant when it appears to consist of a benchmark measurement showing a significant deficit in the very category that RCS has dismissed as not adequately deficient to justify ongoing supportive services.

Additionally, and crucial to the Court's analysis, the failure of RCS to provide B.M. with the placement test prior to the September 14 meeting is exacerbated by its additional failure to collect any other data pertaining to basic reading skills. While easyCBM data are purported to represent the more important source of information for assessing a student's PLEPs—which in turn provide reliable information that the IEP team can use in formulating the IEP—no such data with respect to basic reading skills were available at the September 14 meeting, leaving the

placement test as the only potentially relevant source of information. Subsequent testing indicates that C.M. continued to struggle in this area, with Dr. Kirk measuring his basic reading scores in the 12th percentile (low average range), and his related subcategory score in word reading in just the sixth percentile, which placed him in the "very low range." (Docket No. 20-8 at 33-34.) As such, a placement test that yields a finding that an incoming seventh grader has a reading skill score equivalent to that of a third grader makes it particularly germane to an IEP team attempting to determine which goals and reading intervention program would be governing C.M.'s 2018-19 education.

In short, the Court concludes that the failure of RCS to provide B.M. with the Language! placement test data caused substantive harm by improperly infringing on B.M.'s ability to participate in the IEP meetings and by failing to ensure that the entire IEP team had access to relevant data relating to C.M.'s reading skills.

### c. Interpreter of Results.

Plaintiffs next argue that RCS violated IDEA procedural safeguards by failing to include in the IEP team an individual able to "interpret the instructional implications of evaluation results," as required under 30 C.F.R. § 300.321(a)(5). Plaintiffs claim that although Mr. Caster testified that he served as such an interpreter during the IEP process, he did not sign the signature page corresponding to that role and was unfamiliar with the fundamental differences between basic reading skills, fluency, and comprehension, which precluded the team from formulating an IEP that would provide a FAPE to C.M.

The ALJ rejected this argument at the administrative level, concluding instead that Mr. Caster, "as a special education teacher, was qualified and allowed to attend C.M.'s IEP meetings as the individual who can interpret the instructional implications of evaluation results."

(Docket No. 20-1 at 132-33.) Mr. Caster explained during the administrative hearing that he served as both the special education teacher and the interpreter of evaluation of results, as is permitted under 30 C.F.R. § 300.321(a)(5), and that the policy of RCS was subsequently updated to require that such an individual sign in both places to avoid confusion. (Docket No. 20-4 at 118, 133-34.) Ms. Kasuboski also testified that Mr. Caster was "more than capable of interpreting the PLEP data that was collected by the special ed team." (*Id.* at 776). The Court is satisfied that this does not amount to a procedural violation.

The remaining argument regarding Mr. Caster's purported ignorance is difficult to parse given that Plaintiffs cite nothing in the administrative record for the Court to review. Plaintiffs instead repeatedly reference statements apparently made at one or more of the IEP meetings with citation to "Exhibit 97," which is an audio recording manually filed with the Court that consists of nearly 13 hours of discussion among IEP members, much of it duplicative.[13] Plaintiffs also claim that Mr. Caster's "failure to understand the limitations of the fluency and comprehension assessments resulted in an IEP that did not actually address C.M.'s primary deficit area, Basic Reading Skills." (Docket No. 30 at 23.) This may or may not be the case, as discussed above, although Mr. Caster at least appeared to understand the differences between "basic reading skills," "fluency," and "comprehension" during the administrative hearing. (Docket No. 20-4 at 59.) The Court thus sees no reason to overturn the ALJ's conclusion that Mr. Caster appropriately served as the interpreter of evaluation results.

---

[13] None of the references to this exhibit in Plaintiffs' briefing includes a more precise citation—e.g., a timestamp—that would narrow the adjudicator's review of the discussions referenced by the exhibit. For the benefit of judges before whom Plaintiffs might appear in the future, the undersigned respectfully suggests that counsel provide more than a general citation to massive audio files in their legal memoranda.

### 2. Alleged Substantive Violations

Plaintiffs claim that Defendants committed substantive violations of the IDEA both by developing an IEP that failed to adequately accommodate C.M.'s needs, and by unevenly and inefficiently implementing the Language! program during C.M.'s seventh grade year. As noted, courts faced with allegations of substantive IDEA violations must determine whether the IEP at issue was "reasonably calculated to enable the child to receive educational benefits." *Deal*, 392 F.3d at 853-54.

However, the Court is not required to take up the issue of RCS' substantive compliance in light of its conclusion that, under the first prong of the two-part *Rowley* inquiry, RCS' procedural violations denied C.M. a FAPE by seriously infringing his parents' participation in the IEP process. *Knable*, 238 F.3d at 767; *see also N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1207-08 (9th Cir. 2008) ("The court need not reach the question of substantive compliance if the court finds procedural inadequacies that result in the loss of educational opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation process ….") (internal citation omitted) (cleaned up). The Court indeed has broad authority to grant any relief deemed "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and although Plaintiffs request a finding that the IEP did not confer a meaningful educational benefit on C.M., the Court declines to make such a determination at this juncture given that federal courts are considered to be "generalists with no expertise in the educational needs" of children with disabilities, while state departments of education are indeed "presumed to have expertise in the field." *Burilovich*, 208 F.3d at 566. The Court is particularly willing to embrace this viewpoint where, as here, the administrative record suggests that C.M.'s seventh grade year was a veritable salmagundi of outcomes ranging from inspiring progress to unfortunate setbacks.

Accordingly, the Court will recommend that Plaintiffs be declared the "prevailing party"—defined as "one who succeeds on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit," *Tompkins v. Troy Sch. Dist.*, 199 F. App'x 463, 465 (6th Cir. 2006) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)) (cleaned up)—and that the decision of the ALJ with respect to the procedural violations described above be reversed.

As for other relief sought by Plaintiffs, including a request for reimbursement for the expenses incurred in providing ongoing Wilson instruction, as well as an award of "compensatory education for additional tutoring to place C.M. in the position he would have been in if RCS had provided an appropriate reading program when C.M. enrolled in their district in August of 2018" (Docket No. 30 at 26), the Court will recommend that, should the presiding District Judge adopt the instant Report and Recommendation, the parties provide supplemental briefing indicating that the parties have conferred and agreed to a model of compensation and compensatory education in light of the Court's ruling, or, should the parties be unable to reach such an agreement, delineating with particularity their respective positions for and against any proposals for monetary relief and/or implementation of compensatory education.

### III. RECOMMENDATION

Based on the foregoing, the Magistrate Judge recommends that:

(1) Plaintiffs' motion for judgment on the administrative record be GRANTED;

(2) Defendant's motion for judgment on the administrative record be DENIED; and

(3) Should these recommendations be accepted, the parties be required to confer and provide supplemental briefing with an agreed or competing proposals for financial reimbursement and implementation of compensatory education.

34

ANY OBJECTIONS to this Report and Recommendation must be filed within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(a). Failure to file specific written objections within the specified time can be deemed to be a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Milton*, 380 F.3d 909, 912 (6th Cir. 2004) (*en banc*). Any responses to objections to this Report and Recommendation must be filed within 14 days of the filing of the objections. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(b).

Respectfully submitted,

BARBARA D. HOLMES
United States Magistrate Judge