## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| C.M., the Student, and B.M. and Ca.M., | ) | |
| the Student's Parents, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-1088 |
| | ) | |
| RUTHERFORD COUNTY SCHOOLS. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an appeal from a state Administrative Law Judge's ("ALJ") finding that Rutherford County Schools ("RCS") provided C.M. with a free appropriate public education ("FAPE") during the 2018-2019 school year, as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1414 et seq. The Magistrate Judge has issued a Report and Recommendation ("R&R") (Doc. No. 47) pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, in which she recommends that (1) C.M's Motion for Judgment on the Administrative Record (Doc. No. 29) be granted, and (2) RCS's cross-Motion for Judgment on the Administrative Record (Doc. No. 32) be denied. The Magistrate Judge also recommends that, if the R&R is accepted by the Court, "the parties be required to confer and provide supplemental briefing with an agreed or competing proposals for financial reimbursement of implementation of compensatory education." (Doc. No. 47 at 34). RCS has filed Objections (Doc. No. 54) to the R&R, to which Plaintiffs have responded (Doc. No. 55).

1

# I. **Standards of Review**

Two standards of review govern these proceedings. First, because the R&R would be case dispositive if accepted, the Court's review is de novo under Rule 72. "This does not mean, however, that the Court must 'reinvent the wheel' when taking a fresh look at the matter." Snider v. Saul, No. 3:18-CV-00857, 2020 WL 30217, at *1 (M.D. Tenn. Jan. 2, 2020) (citing Chen v. I.N.S., 87 F.3d 5, 7 (1st Cir. 1996); Franklin v. Anderson, 267 F. Supp. 2d 768, 793 (S.D. Ohio 2003)). Instead, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 73(b)(3). What this means is that case-dispositive matters may be handled by magistrate judges, so long as the district judge retains full and ultimate authority "to make an informed, final determination" of the case. United States v. Raddatz, 447 U.S. 667, 682–83 (1980). This is in keeping with one of the purposes of the Federal Magistrate Act: "to vest 'ultimate adjudicatory power over dispositive motions' in the district court while granting the 'widest discretion' on how to treat the recommendations of the magistrate." Raddatz, 447 U.S. at 675.

Second, "[i]n reviewing an ALJ's decision in an IDEA case, district courts apply a 'modified de novo' standard that requires the court 'to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.'" Somberg on behalf of Somberg v. Utica Cmty. Sch., 908 F.3d 162, 172 (6th Cir. 2018) (quoting Deal v. Hamilton Cty. Bd. of Educ., 392 F.3d 840, 849–50 (6th Cir. 2004)). "When educational expertise is relevant to an ALJ's finding, the reviewing court affords the finding more weight," but the same is not true when such expertise is not relevant because "the court is as well suited to evaluate the issue as the ALJ." Id. (citing McLaughlin v. Holt Pub. Schs. Bd. of Educ., 320 F.3d 663, 669 (6th Cir. 2003)). This standard of review of administrative findings in IDEA

cases "afford[s] less deference than that given to agencies under the substantial evidence test." Burilovich v. Bd. of Educ. of Lincoln Consol. Sch., 208 F.3d 560, 567 (6th Cir. 2000).

## II. Factual Background

The underlying facts as well as a description of the Administrative Hearing are laid out at great length in the R&R (Doc. No. 47 at 3–19) and need not be repeated in the same detail here. Instead, and to give context to RCS's objections, the Court sets forth the salient facts and proceedings that appear not to be in material dispute.

While a fourth grader in the Murfreesboro City Schools ("MCS"), C.M. was diagnosed with dyslexia. As a consequence, MCS provided C.M. with specialized instruction under an individualized educational program ("IEP") that identified goals and accommodations to obtain those goals. At the end of C.M.'s sixth grade school year, MCS developed another IEP that provided some 30 accommodations. The IEP also included the Wilson Assessment of Decoding and Encoding ("Wilson") program to help C.M. with his reading skills.

In August 2018, C.M. became a seventh grader at Whitworth Buchanan Middle School ("Whitworth") in Rutherford County. Later that month, on August 23, 2018, B.M. (C.M.'s mother) forwarded an email to Willard Caster, C.M.'s new case manager, from Dr. Melinda Hirschmann, the Assistant Director for Education Services and School Outreach at the Tennessee Center for the Study and Treatment of Dyslexia at Middle Tennessee State. Dr. Hirschmann recommended that C.M. continue to use the Wilson program in his new school. Nevertheless, the next day, C.M. was administered a placement test under a different reading program called Language! in order for RCS to "determine 'where to start' C.M.'s supportive services, including, 'what level books that [C.M.'s] going to be on and which class [he's] going to be in' within the Language! program." (R&R at 5,

3

citations to record omitted).

Using Language! as the testing method may have been a harbinger of what was to come because that program, rather than Wilson, ended up being C.M.'s reading program under his IEP. At the first meeting to determine C.M.'s new middle school IEP, Caster brought a document he had prepared containing C.M.'s "Present Levels of Performance" ("PLEPs") in the areas of reading fluency, reading comprehension, and pre-vocational skills, showing that C.M. had scored in the 69th percentile for reading comprehension – substantially above the 25th percentile cutoff for students generally entitled to special education services. The testing, however, did not capture C.M.'s PLEP regarding basic reading skills, which was the deficit that formed the basis for C.M. receiving such services. Nevertheless, the PLEPs convinced RCS team members to endorse removing three of the four readings goals used at MCS, including comprehension, spelling, and vowel-consonant word patterns.

The IEP contained only one reading goal, which was to improve C.M.'s score on reading fluency from the 8th percentile of his peer group to the 15th percentile. Like MCS's IEP, it contained additional time for TNReady testing in English/Language Arts, Mathematics, Science, and Social Studies, but it did not retain the Human Reader accommodations that had been permitted for state testing at MCS.

Although B.M. had several concerns with the IEP, including the use of Language! because she believed that Wilson was the only program that met C.M.'s reading needs, she relented. Still, B.M. remained dissatisfied, refused to sign the Informed Parental Consent Form at that meeting, and requested another IEP meeting, which took place 10 days later. After two hours of additional discussion, no changes of any real substance were made as a result of the second meeting. B.M.

4

signed the consent, but two days later sent Caster a letter continuing to take issue with the IEP.

In January 2019, after a dispute about whether C.M. should be evaluated not only for dyslexia but also for Attention Deficit Disorder (with which he had also been diagnosed), a statutorily-required triennial meeting was held to assess C.M.'s continued eligibility for special education services. Dr. Lauren Goss, the psychologist for RCS, conducted the reevaluaton utilizing classroom observations, input from C.M. and his parents and teachers, and a battery of testing that took place in January and February 2019. Her testing found that C.M. placed in the 86th percentile for phonological awareness, 81st percentile for rapid automatized naming, and the 12th percentile for phonological memory, meaning that C.M. was above average in the first two categories, but below average in the third. Dr. Goss determined that C.M. probably did not meet the eligibility requirements for continued basic reading services, and her opinion was shared with the IEP team members at RCS. Those members concurred, but nevertheless referred C.M. to the 504 Team to determine whether he was eligible for services under Section 504 of the Rehabilitation Act, 29 U.S.C. § 701. That Act generally defines disability more broadly than the IDEA, but provides fewer services.

On April 12, 2019, the 504 Team held a meeting, which C.M.'s mother and father both attended. The team determined that C.M. was eligible for services that provided 13 accommodations. C.M.'s parents signed the 504 plan.

Believing that C.M. remained entitled to an IEP under the IDEA, his parents filed a due process complaint with the Tennessee Department of Education on May 1, 2019, contending that RCS failed to provide a FAPE to C.M., and requesting that the ALJ require RCS to provide their son with reading instruction pursuant to Wilson until all 12 steps of the program were completed. They

5

also requested an Independent Educational Evaluation ("IEE"). That request was agreed to, and paid for, by RCS.

The IEE, consisting of a series of tests, was conducted by Dr. Emily Kirk at the Currey Ingram Academy Diagnostic Center in June 2019. The results of that test are summarized in the R&R as follows:

> Dr. Kirk completed her report on August 28, 2019, which documented scores placing C.M. in the 14th percentile for basic reading (low average), 13th percentile for reading comprehension and fluency (low average), and the 5th percentile for spelling (very low). The report noted that C.M.'s scores were in the average range when he was asked to decode words without being timed, but he scored in the very low range when timed. Overall, his fluency and comprehension measurements were consistently in the low average range, which led Dr. Kirk to opine that he met the diagnostic criteria for an SLD "with impairment in reading." Dr. Kirk described the severity of C.M.'s dyslexia as "mild" but recommended that he continue receiving "research-based intervention" for his reading, fluency, and comprehension deficits, with an emphasis on phonological awareness, sound-symbol correspondences, and syllable patterns.

(R&R at 47 at 9-10).

The ALJ held a four-day hearing, during which she heard from what she characterized as eleven "key witnesses." (Doc. No. 1-2 at 2). Those witnesses included C.M. and his parents; Sandra Parus, plaintiff's reading specialist witness/expert, who is certified as a Wilson Dyslexia Practitioner; case manager Caster; RCS's district-wide IDEA compliance specialist; Elizabeth Grace, C.M.'s 7th grade reading intervention specialist; C.M.'s English Language Arts teacher; his social studies teacher; and Dr. Goss, who testified as an expert in school psychology on behalf of RCS. (Doc. No. 1-2 at 2). Based upon the evidence at the hearing, the ALJ entered a 65-page Final Order, containing 244 paragraphs of factual findings.

So far as relevant here, the ALJ determined: (1) the IEP provided C.M. with a FAPE for the 2018-2019 school year; (2) C.M. was thoroughly evaluated, given appropriate goals, and provided

with specific instruction to meet his unique needs; (3) RCA did not predetermine that Language! would be C.M.'s reading program to the exclusion of all others, the accommodations that would be included in his IEP, or his exit from special education services; and (4) there was no procedural violation of the IDEA. (F.O. at ¶ 37, 50, 63,73, 94, 95, 104). The ALJ held that Plaintiffs failed to meet their burden of proof by a preponderance of the evidence, and, therefore, RCS was entitled to prevail on Plaintiff's claims under the IDEA and Section 504 of the Rehabilitation Act.

The Magistrate Judge disagreed with several of the ALJ's conclusions, finding that (1) RCS predetermined some of the IEP before the team first met on September 14, 2018, leading to C.M. not receiving the same quantity or quality of accommodations that he had at MCS; and (2) improperly predetermined that Language! would be the reading program used by C.M. Such "procedural irregularities" according to the Magistrate Judge, resulted in substantive harm that deprived C.M. of a FAPE. (R&R at 25). The Magistrate Judge further concluded that RCS prevented B.M. from meaningful participation in the IEP meetings by failing to provide the results of C.M.'s Language placement test, and that this, too, caused substantive harm. (R&R at 27-30). On the other hand, the Magistrate Judge found no procedural violation from RCS's failure to provide "an individual to 'interpret the instructional implications of evaluation results'" on the IEP team as required by 30 C.F.R. § 300.321(a)(5)." (Id. at 47). Finally, in light of the determination of procedural violations causing substantive harm, the Magistrate Judge found it unnecessary to consider Plaintiffs' substantive claims that RCS failed to adequately accommodate C.M.'s needs, and "unevenly and insufficiently implement[ed] the Language! Program during C.M.'s seventh grade year." (Id. at 33).

### III. LEGAL DISCUSSION

RCS raises three specific objections to the R&R. Prior to doing so, however, it levels a

broad-based attack, asserting that "[t]he reasoning behind the Report is fundamentally flawed"; "unduly expands" Sixth Circuit authority; "strips away the discretion of school officials to remain flexible"; requires school officials "to engage in a debate with a student's parents"; and "fails to accord[] due deference to the ALJ's decision." (Doc. No. 53 at 1-2). RCS concludes its introductory paragraph with the following:

> Under the Report, parents of students, as laypersons, will have the ability to force school officials, who are educational experts, to provide their children with the parents' preferred method of delivering special education services even in situations where the school agrees to provide the parent's requested service, albeit via a different commercial product, and even after multiple hours-long IEP meetings and review of the school's review of relevant data. As it is evident from the record, C.M. appropriately progressed under the 2018 IEP, so much so that he was exited special education at the end of the school year, a finding by the ALJ that the Report notably does not quibble with.

(Id. at 2).

This Court does not envision the parade of horribles set forth by RCS. That said, the Court finds this to be a close case but, unlike the Magistrate Judge, cannot not say that the evidence in the record preponderates in Plaintiff's favor on the predetermination issues.

Before discussing the specific objections, the Court notes several general principles of law that are important to any review of ALJ's rulings in the IDEA context. First, "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 207 (1982). Second, "federal courts are 'generalists with no expertise in the educational needs' of students who have disabilities[.]" Gibson v. Forest Hills Loc. Sch. Dist. Bd. of Educ., 655 F. App'x 423, 426 (6th Cir.

8

2016) (quoting Fry v. Napoleon Cmty. Sch., 788 F.3d 622, 626 (6th Cir. 2015)); see also, Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008) ("Judges are not trained pedagogues, and they must accord deference to the state agency's application of its specialized knowledge.").  Third, and related to the first two points, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.  Fourth, only if a procedural violation results in substantive harm – *viz* denial of a FAPE (of which meaningful parental participation is an integral part) – can relief be granted.  Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001). Fifth, and finally, "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." Burilovich, 208 F.3d at 567.

## A.  Predetermination by Choosing Language! Reading Program

The IDEA requires school districts to include the parents in the team that drafts the IEP, to consider "the concerns of the parents for enhancing the education of their child," and to address "information about the child provided to, or by, the parents." 20 U.S.C. § 1414(d)(3)(A)(ii), (d)(4)(A)(ii)(III). As a consequence, a school cannot predetermine the educational program for  a disabled student. "Predetermination amounts 'to a procedural violation of the IDEA'" that "can cause substantive harm, and therefore deprive a child of a FAPE, where parents are 'effectively deprived' of 'meaningful participation in the IEP process.'" Nack ex rel. Nack v. Orange City Sch. Dist., 454 F.3d 604, 610 (6th Cir. 2006).

9

With respect to this predetermination claim, the Sixth Circuit's decision in <u>Deal v. Hamilton</u> <u>Cty. Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004) provides the analytical framework. At issue there was whether the school district erred in refusing to consider the "Lovaas style ABA" (applied behavioral analysis) program for an autistic child named Zachary, regardless of his demonstrated individual needs. <u>Id.</u> at 855. Without "explicitly reject[ing] any of the ALJ's findings of fact on the issue of predetermination, the district court simply concluded that '[t]he facts of this case do not add up to predetermination on the part of' the school district.'" <u>Id.</u> at 857. Because the predetermination issue presented mixed questions of law and fact, the Sixth Circuit considered the matter de novo and concluded the evidence showed that the "school district had pre-decided not to offer Zachary intensive services regardless of any evidence regarding Zachary's individual needs and the effectiveness of his private program" <u>Id.</u> at 857. The Sixth Circuit wrote:

> The facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program. This conclusion is bolstered by evidence that the School System steadfastly refused even to discuss the possibility of providing an ABA program, even in the face of impressive results. Indeed, School System personnel openly admired and were impressed with Zachary's performance (presumably attained through the ABA program), until the Deals asked the School System to pay for the ABA program. Several comments made by School System personnel suggested that they would like to provide Zachary with ABA services, i.e., they recognized the efficacy of such a program, but they were prevented from doing so, i.e., by the School System policy. The clear implication is that no matter how strong the evidence presented by the Deals, the School System still would have refused to provide the services. This is predetermination.

> The district court erred in assuming that merely because the Deals were present and spoke at the various IEP meetings, they were afforded adequate opportunity to participate. Participation must be more than a mere form; it must be meaningful. Despite the protestations of the Deals, the School System never even treated a one-on-one ABA program as a viable option. Where there was no way that anything the Deals said, or any data the Deals produced, could have changed the School

10

System's determination of appropriate services, their participation was no more than after the fact involvement.

Id. at 858 (internal citations and footnote omitted).

To be sure, there are parallels between the facts here and those presented in Deal. The Magistrate Judge identified those parallels, beginning with Caster bringing a draft to the initial IEP meeting that removed all but eight of the thirty accommodations that had been provided at MCS. Further, even before the meeting, Caster had C.M. take the Language! placement test to assess where C.M. should start and which class he would be in, notwithstanding that (1) Caster received an email from Dr. Hirschmann asserting C.M. should continue to receive instruction pursuant to the Wilson program; and (2) C.M. had studied under the Wilson program for several years, completing approximately 75% of it. "Such evidence," the Magistrate Judge opined, "is sufficient to establish that RCS did not meaningfully consider a literacy program other than Language!" (R&R 24).

Relying on Deal, the Magistrate Judge observed that "[t]he Sixth Circuit has emphasized that improper determination of an IEP exists in situations where 'no matter how strong the evidence presented by the parents, the school still would have refused to provide the services' requested for their child." (Id. at 25, quoting Deal, 392 F.3d at 858). The problem with applying Deal's statement here, however, is that C.M. was not deprived of the "services" his parents requested.

B.M. requested that RCS provide C.M. with "intensive, explicit, systematic and cumulative, structured, multi-sensory and language-based" reading intervention services, with her clear choice being Wilson. (Doc. No. 20-5 at 1969–1972). However, the administrative record showed, and the ALJ found, that Language! and Wilson are comparable programs. Both are structured reading programs that are designed to improve upon a student's weaknesses in reading, but use different

11

assessments to determine the same reading skills. (Doc. No. 20-4, Tr. at 644; F.O. ¶ 54). Furthermore, and unlike in <u>Deal</u> where "School System personnel attended IEP meetings having 'preselected' the extant School System program," <u>Deal</u>, 392 F.3d at 855, Language! was not the "extant program" for RCS schools. True, Language! was the preferred program at Whitworth (and perhaps even in the county generally) because it was available at the school and teachers had been trained in it. Still, RCS utilizes several other reading intervention programs, including S.R.A., Lexia, and S.P.I.R.E, and "some Wilson Reading." (Doc. No. 20-4 , Tr. at 643). In fact, Caster teaches S.R.A. in his own reading intervention classes. (<u>Id.</u> Tr. at 77).

Moreover, and contrary to <u>Deal</u> where there was evidence that "the parents could not ask questions during the . . . IEP meeting," <u>Deal</u> at 855, B.M. effectively advocated for her son at both IEP meetings. At the first meeting B.M. was accompanied by Eileen Miller, an IDEA advocate and owner of Ignite Dyslexia in Williamson County, Tennessee, member of the Tennessee Department of Education Dyslexic Advisory Council, and founding member of Decoding Dyslexia TN. (F.O. at 5–6). Methodologies and the use of Language! versus Wilson were discussed at the meetings, as was the fact that C.M.'s special education teacher had training in Language!. (Doc. No. 20-5 at 1969–1972). Further, while the Magistrate Judge acknowledged Miller's assertion that B.M. was "involved and able to interject, comments, and make suggestions," but dismissed the assertion as "dubious" because Caster was "not equipped to meaningfully explain how selecting Language! and Wilson was . . . as insignificant as choosing between 'a Tylenol or and Advil," (R&R at 25), this Court cannot simply dismiss Miller's observations on that basis.

"The IEP-development process is a cooperative one," <u>A.K. ex rel. J.K. v. Alexandria City Sch. Bd.</u>, 484 F.3d 672, 681 n.4 (4th Cir. 2007) and, "although the concept of 'predetermination'

applies only to [school] districts and is not a two-way street," L.M., ex rel. M.M. v. Downingtown Area Sch. Dist., No. 12-CV-5547, 2015 WL 1725091, at *13 (E.D. Pa. Apr. 15, 2015), the Court would be remiss in neglecting to mention B.M.'s position during the two IEP meetings. Just as she claims Caster was insistent that C.M. use Language!, so, too, she believed that Wilson was the only reading program that would meet her son's needs. See, Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005) ("The core of the statute . . . is the cooperative process that it establishes between parents and schools" and "[t]he central vehicle for this collaboration is the IEP process.").

Where the procedural requirement of the IDEA regarding the formulation of an IEP are met, "Plaintiffs are not entitled to prescribe or require a specific desired methodology[.]" Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor, 185 F.3d 635, 645 (6th Cir. 1999). "Formulating the IEP's substantive educational benefits most often concerns methodology, such as deciding between alternative programs or methods for educating a disabled student [and] these types of decisions require the school district's educational expertise." L.H. v. Hamilton Cty. Dep't of Educ., 900 F.3d 779, 789 (6th Cir. 2018) (citing McLaughlin v. Holt Public Schools Bd. of Educ., 320 F.3d 663, 673 (6th Cir. 2003)). Therefore, courts must not "adopt the problematic role of education policymaker" and should refrain from "dictat[ing] which pedagogical methods a school district must consider and to what degree they must be incorporated on an individualized, case-by-case basis—an outcome the Supreme Court has specifically cautioned against." Renee J. ex rel. C.J. v. Hous. Indep. Sch. Dist., 913 F.3d 523, 530 (5th Cir. 2019) (citing Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 992 (2017)). Accordingly, application of the controlling standards of review compels the Court not to accept this portion of the R&R

B. **Predetermination of Accommodations**

13

The Magistrate Judge also found that "RCS improperly determined that C.M. would not receive the same quantity or quality of accommodations he had received at MCS." (Doc. No. 47 at 24). The basis for this conclusion was that, because C.M. was now in middle school, Caster came to the September 14 meeting with a draft IEP that eliminated several of the accommodations that C.M. had been granted at MCS. That was error, according to the Magistrate Judge, because, "as noted by RCS' compliance specialist, there is no authority suggesting that accommodations provided for students in elementary school are somehow unique and cannot apply to individuals in middle school." (Id.).

"Predetermination is not synonymous with preparation." Nack, 454 F.3d at 610. (6th Cir. 2006). Rather, "[t]he regulation prohibits a completed IEP from being presented at the IEP Team meeting or being otherwise forced on the parents, but states that school evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions." N.L. ex rel. Mrs. C. v. Knox Cty. Sch., 315 F.3d 688, 694 (6th Cir. 2003). In fact, "it is standard practice for an assessment team to draft a report before the IEP Team meeting," and "Tennessee regulations require an assessment team to evaluate a student's eligibility and prepare an assessment report prior to the IEP Team meeting." Id. Thus, "'[t]hat members of the IEP team may have had 'pre-formed opinions' regarding [C.M.]'s placement and accommodations is irrelevant," L.C. on behalf of A.S. v. Issaquah Sch. Dist., No. C17-1365JLR, 2019 WL 2023567, at *21 (W.D. Wash. May 8, 2019) (quoting Nack, 454 F.3d at 610), so long as Caster and the other team members were willing to listen and B.M. was allowed meaningful input.

As already noted, B.M. was allowed to meaningfully participate in the drafting of the IEP.

14

In fact, Caster's draft IEP was changed as a result of her and Miller's suggestions. Based upon audio recordings, RCS has represented in its Objections, and Plaintiffs have not disputed, that details as to the amount of time needed to complete assignments and tests were only filled in after B.M. provided information about how long it takes C.M. to complete his homework. (Doc. No. 53 at 17). Likewise, the original accommodation of giving C.M. copies of notes only as needed, was changed to "at the beginning of class," at the request of B.M. (Id.). Further, three accommodations were added at the suggestion of Miller. (Id. at 18). And, while some members of the IEP team did not believe C.M. needed to be allowed to retake classroom tests, that accommodation was included at B.M.'s request. (Id.).

Nor can the Court conclude from the record, as the R&R does, that accommodations were eliminated solely and wrongfully because C.M. had transitioned from elementary to middle school. Just by way of examples, a "read aloud" accommodation for classroom testing was rejected because it was not necessary based on C.M.'s grades; he was not eligible for reading aloud on state testing; and changing procedures as between classroom and state testing could lead to anxiety. (Id. at 18). A pacing accommodation was not added, although requested by B.M., because Miller indicated she did not believe C.M. would need that accommodation. Even so, the team was instructed to monitor C.M., and if it was needed, pacing could be added as an accommodation. Moreover, the record shows that all of B.M.'s suggested accommodations were discussed at the IEP meetings, and the IEP team provided grounds for denial, none of which were rejected solely because B.M. was entering middle school, regardless of what Caster may have thought. (Id.). The point of these examples is that there unquestionably was give-and-take during the process, including the holding of a second meeting after B.M. emailed her concerns to Caster. The fact that Caster sent an email to Chip Fair,

RCS's Compliance Officer, on September 19, 2018 stating "he [C.M] doesn't need all of those accommodations like in elementary  (Doc. No. 20-5 at 1963) is hardly proof that this was RCS's unwaivering position, contrary to what Plaintiff's response brief (Doc. No. 54 at 5) seems to argue.

"Predetermination occurs when the state makes educational decisions too early in the planning process, in a way that deprives the parents of a meaningful opportunity to fully participate as equal members of the IEP team." E. R. by E. R. v. Spring Branch Indep. Sch. Dist., 909 F.3d 754, 769 (5th Cir. 2018) (citation omitted).  "The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such." White ex rel. White v. Ascension Parish Sch. Bd., 343 F.3d 373, 380 (5th Cir. 2003) (citations omitted).  As has been recently observed:

> The case law tends to demonstrate that predetermination is a high bar. If courts were quick to hold that a school's actions are predetermination, it could encourage schools to come to IEP meetings with no plan at all, creating an incentive for inadequate preparation. In the alternative, it may encourage schools to create ill-fitting plans so they could make some 'concessions' to avoid a finding of predetermination. To avoid these extremes, a court should be slow to hold that a plan is predetermined, but it should still ensure that the IEP is individualized and made with adequate parental participation.

D.S. by & through R.S. v. Knox Cty., No. 3:20-CV-240, 2021 WL 6496726, at *7 (E.D. Tenn. June 21, 2021).

Based on the administrative record, the Court simply cannot find by a preponderance of the evidence either that C.M.'s accommodations were predetermined by Caster, or that B.M. was deprived of her right to meaningfully participate in the crafting of the final IEP.  Indeed, B.M. signed the IEP after the second meeting, acknowledging her agreement with its contents, a fact given little weight in the R&R.  See Berger v. Medina City Sch. Dist., 348 F.3d 513, 524 (6th Cir. 2003)

(observing that, by signing IEP, plaintiff indicated their agreement with the decision contained therein).

## C. **Failure to Provide Data**

The Magistrate Judge found that "RCS committed a procedural violation by failing to supply the Language! placement data prior to the September 14 IEP meeting," noting that (1) ten days before the first IEP meeting, B.M. requested "any data" collected by RCS; (2) four days after the first IEP meeting, B.M. emailed Grace (the reading intervention specialist) requesting C.M.'s Language! placement testing results, but was referred to Chip Fair, RCS's Compliance Officer; and (3) B.M. left a voicemail for Fair, requesting the data. (R&R at 28). The Magistrate Judge also found that RCS's failure to provide B.M. the requested information resulted in substantive harm.

The Court agrees with the R&R that this failure might be viewed as being a "procedural fumble," (Id. at 27), but it is ill-equipped to conclude that the fumble caused substantive harm. As was acknowledged in the R&R, the placement test "does not place the scores in any meaningful context for a lay reader," (Id. at 28), and the Court does not believe that the answer necessarily can be found in, or extrapolated from, the training materials for a commercial product whose author is unknown. This remains true even though, as Plaintiffs argue in their response, the training materials were "admitted as substantive evidence in the underlying hearing." (Doc. No. 54 at 4).

Regardless, the Court does not see the substantive harm, even leaving aside the issue of whether it requires educational expertise to determine if the Language! placement result were relevant for crafting C.M.'s reading goals. Without doubt, "[t]he procedural requirements of the IDEA entitle parents of a disabled child to '"examine all records relating to such child,"' 20 U.S.C. § 1415(b)(1)," Barnett v. Memphis City Sch., 113 F. App'x 124, 128 (6th Cir. 2004), and "the

17

relevant legislative history suggests Congress intended [records] to be interpreted expansively." Pollack v. Re"l Sch. Unit 75, No. 2:13-CV-109-NT, 2015 WL 1947315, at *7 (D. Me. Apr. 29, 2015). Even so, under the second prong of the Supreme Court's decision in Rowley, 458 U.S. at 208, only those procedural violations causing substantive harm can entitle a party to relief. Such harm arises only when the violation "seriously infringes upon the parents' opportunity to participate in the IEP process." Deal, 392 F.3d at 859.

Plaintiffs have not established substantive harm as a result of RCS's failure to respond to B.M.'s request for the Language! placement data. Even crediting the testimony of Kate Kasuboski, the Coordinator of Special Education for RCS, that such data "might help the team," (R&R at 28), there was no question that C.M. had problems with basic reading skills. More importantly, B.M. became aware at least by the time of the second IEP team meeting that C.M. had tested into Book C of Language!, and that program had entry points in books A, C, and E. (Doc. No. 20-5 at 1969-1972). See, Berger., 348 F.3d at 520 (affirming decision that child was not denied a FAPE where, although IEP did not include required evaluation of child's present level of educational performance, child's performance was in fact being evaluated and teachers and parents were in regular communication); Viola v. Arlington Cent. Sch. Dist., 414 F. Supp.2d 366, 379 (S.D.N.Y.2006) (district's failure to complete annual review of goal mastery prior to developing next year's IEP did not render IEP inadequate where information contained in annual review was known to participants at development meeting).

## D. Remaining Matters

Having resolved the objections to the R&R, two matters remain for review.

**First**. The Magistrate Judge found no procedural violation regarding Plaintiffs' assertion that

RCS violated 30 C.F.R. § 300.321(a)(5) by "failing to include in the IEP team an individual able to 'interpret the instructional implications of evaluation results[.]'" No objections have been filed to this portion of the R&R. Quite the contrary, in their response, "Plaintiffs agree with the thorough analysis and opinion included in the Report and Recommendation and . . . adopt those findings and conclusions." (Doc. No. 54 at 3).

Having reviewed the matter de novo, the Court agrees with this portion of the R&R and finds "no reason to overturn the ALJ's conclusion that Mr. Caster appropriately served as the interpreter of evaluation results." (R&R at 32).

**Second.** The Magistrate Judge found "RCS' procedural violations denied C.M. a FAPE by seriously infringing his parent's participation in the IEP process," and she thus found it unnecessary "to take up the issue of RCS' substantive compliance" by (1) allegedly failing to develop an IEP that adequately accommodated C.M.'s needs, and (2) unevenly and inefficiently implementing the Language! Program during C.M.'s seventh grade year. (Doc. No. 47 at 33). See, N.B. v. Hellgate Elem. Sch. Dist., 541 F.3d 1202, 107-08 (9th Cir. 2016) (citation omitted) ("[T]he court need not reach the question of substantive compliance if the court finds procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits."). However, because the Court has decided the predetermination issues differently, those questions remain.

A school system is not required to "maximize each child's potential commensurate with the opportunity provided other children," Rowley, 458 U.S. at 198, 102 S.Ct. 3034, but must "confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue." Deal, 392 F.3d at 862. "The facile answer to the question" of what level of education must be provided to a

19

RCS violated 30 C.F.R. § 300.321(a)(5) by "failing to include in the IEP team an individual able to 'interpret the instructional implications of evaluation results[.]'" No objections have been filed to this portion of the R&R. Quite the contrary, in their response, "Plaintiffs agree with the thorough analysis and opinion included in the Report and Recommendation and . . . adopt those findings and conclusions." (Doc. No. 54 at 3).

Having reviewed the matter de novo, the Court agrees with this portion of the R&R and finds "no reason to overturn the ALJ's conclusion that Mr. Caster appropriately served as the interpreter of evaluation results." (R&R at 32).

**Second.** The Magistrate Judge found "RCS' procedural violations denied C.M. a FAPE by seriously infringing his parent's participation in the IEP process," and she thus found it unnecessary "to take up the issue of RCS' substantive compliance" by (1) allegedly failing to develop an IEP that adequately accommodated C.M.'s needs, and (2) unevenly and inefficiently implementing the Language! Program during C.M.'s seventh grade year. (Doc. No. 47 at 33). See, N.B. v. Hellgate Elem. Sch. Dist., 541 F.3d 1202, 107-08 (9th Cir. 2016) (citation omitted) ("[T]he court need not reach the question of substantive compliance if the court finds procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits."). However, because the Court has decided the predetermination issues differently, those questions remain.

A school system is not required to "maximize each child's potential commensurate with the opportunity provided other children," Rowley, 458 U.S. at 198, 102 S.Ct. 3034, but must "confer a 'meaningful educational benefit' gauged in relation to the potential of the child at issue." Deal, 392 F.3d at 862. "The facile answer to the question" of what level of education must be provided to a

19

disabled child "is that a school district is only provided education programming that is reasonably calculated to enable the child to derive more than de minimus benefit." Deal, 392 F.3d at 362 (6th Cir.2004). "At some point, however, this facile answer becomes insufficient. Indeed, there is a point at which the difference in outcomes between two methods can be so great that provision of the lesser program could amount to denial of a FAPE." Id. at 362-63.

Whether the IEP developed for C.M. "confer[red] a 'meaningful educational benefit' gauged in relation to [his] potential," Id. at 363, is a question the Court cannot answer on the present record. As the Magistrate Judge aptly noted, she was fortunate to dodge this question because "the administrative record suggests that C.M.'s seventh grade year was a veritable salmagundi of outcomes ranging from inspiring progress to unfortunate setbacks." (Doc. No. 47 at 33).

The Court needs further briefing focused on this specific question. It may even be necessary to hold oral arguments, or hear from expert witnesses to determine whether C.M. received a FAPE. See, Somberg, 908 F.3d at 174-75 ("The court may consider evidence outside of the administrative record and issues that were not presented to the ALJ if they are relevant to the issues that were before the ALJ" and "[w]hen a district court looks beyond the administrative record, its decision to do so is reviewed under an abuse-of-discretion."); Deal, 392 F.3d at 850 ("This Court has taken an expansive view of the scope of additional evidence that may supplement the administrative record."). Before the parties go through this additional time and expense, however, they will be required to mediate the remaining and overriding question of whether C.M. received at FAPE while a seventh grader at Whitworth.

### IV.  Conclusion

Based upon the foregoing, and as set forth in more specifics in the accompanying Order, the

Report and Recommendation will be accepted in part and rejected in part; the parties' cross motions for judgment on the administrative record will be granted in part and denied in part consistent with the R&R;  the parties will be ordered to mediation; and if mediation is unsuccessful, the parties will be required to submit further briefing and/or attend a hearing that may require supplementation of the record.

_____

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE